### RABINOWITZ et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit.  March 9, 1915.)

No. 170.

1. CONSPIRACY ⊛⟶33—TO COMMIT OFFENSE AGAINST UNITED STATES—SUFFICIENCY OF EVIDENCE.

Evidence considered, and *held* to sustain a conviction of defendants for conspiracy to commit an offense against the United States by concealing assets of an estate in bankruptcy from the trustee.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 60; Dec. Dig. ⊛⟶33.]

2. CRIMINAL LAW ⊛⟶147—CONSPIRACY TO COMMIT OFFENSE AGAINST UNITED STATES—LIMITATION.

The provision of Bankr. Act July 1, 1898, c. 541, § 29d, 30 Stat. 554 (Comp. St. 1913, § 9613), limiting the time for prosecutions for offenses arising under the act to one year, does not apply to a prosecution for conspiracy under Cr. Code (Act March 4, 1909, c. 321) § 37, 35 Stat. 1096 (Comp. St. 1913, § 10201), although the conspiracy charged is to commit an offense under the bankruptcy act, such prosecution being governed by the general limitation of three years contained in Rev. St. 1044 (Comp. St. 1913, § 1708).

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 271, 272; Dec. Dig. ⊛⟶147.]

---

⊛⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Southern District of New York.

This cause comes here upon writ of error to review a judgment of conviction of the crime of conspiring to commit an offense against the United States, namely, that the defendants should conceal certain assets belonging to their estate in bankruptcy from the trustee of such estate.

Carl E. Whitney, of New York City (Walter C. Noyes, of New York City, of counsel), for plaintiffs in error.

H. Snowden Marshall, U. S. Atty., of New York City, R. B. Wood and Raymond H. Sarfaty, Asst. U. S. Attys., both of New York City.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. [1] As in most prosecutions for conspiracy, the testimony was largely circumstantial. As defendant stated the government's case it was based on four propositions: (1) Rabinowitz Bros. had had substantial assets a short time before their failure, which had largely disappeared at the time of failure. (2) The circumstances showed an intention to conceal such assets. (3) International Flouncing Company was a concern of the bankrupts. (4) Goods which belonged to the bankrupts were traced into the possession of the Flouncing Company.

It will not be necessary to state the testimony at any length; reference may be had to the opinion of Judge Hand, denying motion to set aside the verdict. (See page 849.) The brief of plaintiff in error is confined entirely to the fourth proposition, supra, and deals with the testimony as to 14 cases of goods, on which the government mainly relies. In different lots between August 30th and September 9th these cases were deposited in the Linde warehouse in the name of defendant Bokal. Later in the same month the same 14 cases were withdrawn from the Linde warehouse and deposited in the Schenck warehouse, the receipt being given to Epstein, another defendant. Subsequently they were withdrawn from the Schenck warehouse and delivered to the Flouncing Company. The theory of the government was that the 14 cases, which were deposited in the Linde warehouse in Bokal's name, belonged to Rabinowitz Bros. Bokal was not a partner in that firm, but was a relation by marriage of the partners. In order to sustain its theory the government made proof of certain deposits of goods by Rabinowitz Bros. in the Mercantile warehouse and of certain withdrawals of the same. Evidently the jury accepted the government's theory. The contention here is that they were misled by a coincidence of numbers between some of the cases drawn from the Mercantile and some of those deposited in the Linde warehouse.

Rabinowitz Bros. deposited in the Mercantile warehouse between December 7, 1909, and March 19, 1910, a very large number of cases, with a great variety of numbers, some with letters and some without, some numbers running in sequence, but many more not thus numbered. Among these there were deposited on January 21, 1910, two cases numbered 601 and 602. These cases were withdrawn on September 1,

1910. The entries in the books of the Linde warehouse showed deposits as follows:

Harry Bokal, 167 Wooster Street.

| 1910 | | Lace | | | | Rate 30/30 |
|------|---|------|---|---|---|---|
| Aug. | 30 | 4 cs. | 8 | | | 603 |
| | | | | | | 604 |
| | | | | | Ins. $11.90 paid | 606 |
| | | | | | | 607 |
| Sept. | 1 | 3 | " " | | | 600 |
| | | | | | | 602· |
| | | | | | | 605 |
| " | 2 | 2 | " " | | | 601 |
| | | | | | | 608 |
| " | 6 | 4 | " " | | | 610 |
| | | | | | | 611 |
| | | | | | | 612 |
| | | | | | | 613 |
| " | 9 | 1 | " " | | | 609 |
| | | | | | Sept. 22, 10 | Sept. 21. |

The government, of course, relied on the coincidence of numbers on the two cases 601 and 602 appearing on the records of both warehouses as showing that those were Rabinowitz goods which passed from the Mercantile warehouse through the Linde and Schenck warehouses to the Flouncing Company. The trial judge referred to this coincidence twice in his charge, and undoubtedly it influenced the jury. Defendant's counsel, while admitting that the coincidence referred to is, upon first glance, entitled to much weight, contends that when the two records are more carefully examined, the presence of the Nos. 601 and 602 in the Linde entry "demonstrates that they could not have come from the Mercantile warehouse." The argument is this: The 14 cases are all numbered in sequence 600 to 613; the only reasonable explanation of the sequence is that some person owned a single lot of 14 cases of goods marked in sequence and deposited them in parcels in the Linde warehouse. To this proposition we assent; also to the proposition that the cases were all numbered before they were deposited. From this it is contended that Nos. 601 and 602 in the Linde warehouse must have been some other cases (though bearing the same numbers) than those deposited in the Mercantile. It is argued:

"The first deposit was made August 30 and the two Mercantile cases were not withdrawn until September 1st. So about the only way we can think of that the cases could have been marked in sequence and include the two Mercantile cases is to suppose that the Rabinowitzes obtained the numbers of those cases before August 30th, and then marked the other cases to correspond with them for the purpose of perpetuating the Mercantile numbers. But any such marking would have been objectless."

We agree in thinking such marking would have been objectless, and that the suggested theory is unreasonable. Defendant suggests, as the only other theory consistent with ownership by Rabinowitz Bros., that these 14 Linde cases had been one lot numbered in sequence before the two cases had been deposited in the Mercantile warehouse on January 21, 1910. With this suggestion we also agree, but are not persuaded by the argument based thereon, viz.:

"But no other cases in the sequence were in the Mercantile, and it is about as inconceivable as the first possibility that these 2 cases, which had been in storage for 10 months, should have been taken out and should then have *happened* to be reassembled with the 12 other cases at this particular time and place."

It seems to us that a natural and reasonable explanation, which would account for the facts disclosed by the warehouse records is this. Prior to January 21, 1910, Rabinowitz Bros. owned 14 cases, marked in sequence 600 to 613, the contents of which they had no occasion immediately to make up. Twelve of these cases they placed in their own loft; they had a large one, and two witnesses testified that until about a month or so before bankruptcy it was so filled with merchandise, some of it in cases, that it was difficult to move about in it. Two of these 14 sequence cases they deposited in the Mercantile warehouse, possibly in order to get cash advances on them—the books of the warehouse indicate that loans were made on Nos. 601 and 602. About the end of August or the beginning of September, apprehending bankruptcy (petition was filed September 15th) they undertook to save these goods, and wished, for some purpose, to keep the entire lot of 14 cases intact. Therefore they sent the 12 cases from their loft to the Linde warehouse, repaid the advances on the other two, and transferred them from the Mercantile to Linde and deposited them with the other 12 in Bokal's name. The elevator men from the building where their loft was located speak of some 8 or 10 cases coming down about that time.

We are satisfied that the jury were not misled to defendant's prejudice by the coincidence of numbers; indeed the government's case was a very strong one even without such coincidence.

[2] It is further contended that the indictment should have been dismissed because it was not found within one year of the commission of the offense. Section 29d of the Bankruptcy Act provides:

"A person shall not be prosecuted for any offense arising under this act unless the indictment is found or the information is filed in court within one year after the commission of the offense."

Defendants were indicted under section 37 of the Criminal Code for conspiracy to commit an offense against the United States. Prosecutions for conspiracy are regulated by the general limitation statute (section 1044, U. S. Rev. Stat.), which prescribes a period of three years. Section 29d does not modify or repeal that section. The offense "conspiracy" is not one "arising under the Bankruptcy Act." If Congress had intended to change the existing statutes it would have used more definite language, or language inconsistent with such statutes. United States v. Comstock (C. C.) 162 Fed. 416; United States v. Hirsch, 100 U. S. 33, 25 L. Ed. 539.

The judgment is affirmed.

NOTE.—The following is the opinion of Learned Hand, District Judge, on denying the motion for a new trial:

LEARNED HAND, District Judge. I do not think it is necessary to rehearse the evidence at length. The chief question is whether there was any evidence justifying the inference that the 14 cases which Epstein entered at

Linde's Warehouse in Bokal's name were goods which came from the Rabinowitzes. As the goods were traced directly back to the Rabinowitzes, there is no need of further implication of Bokal and Epstein than arises from their assistance in concealing them, once their identity is established.

The inference that the Rabinowitzes concealed goods was amply supported by the receiver's testimony that their place had been gutted, by the testimony of the creditors as to the stock on hand in August, by the bankrupts' admissions up to the eve of bankruptcy, and by the testimony of the elevator boy to one removal of 8 or 10 cases. It is further corroborated by the withdrawal of 26 cases from the warehouse between August 1st and the failure. Bokal was their brother-in-law, had helped them before the failure, and lent them his credit afterwards. Levenson was in business with Bokal, and Levenson was a mere dummy for the Rabinowitzes to use in their new business. Thus we have at the outset facts pointing to secreting of goods, and Bokal as a friendly disposed person, the backer of their new enterprise.

The coincidence in the dates of removal and storage is as follows:

| Rabinowitzes Removed from Their Warehouse | | Epstein Stored in Bokal's Name at Linde's | |
|---|---|---|---|
| August 26 | 3 | August 30 | 4 |
| August 30 | 2 | September 1 | 3 |
| September 1 | 8 | September 2 | 2 |
| | | September 6 | 4 |
| Between August 26 and September 1 | 13 | Between August 30 and September 6 | 13 |

These dates permit of the inference that 13 of the cases were the same. The identity of two case numbers may, perhaps, also be mentioned as not wholly negligible. The contents of the cases withdrawn was described as laces and "white goods"; that of those stored was described as "laces," they might therefore from this description be the same goods.

Epstein entered the goods at Linde's for Bokal, to whom the documents were sent personally by mail. At the very time when he began entering them at Linde's, about September 1st, he was already arranging for their transfer to Schenck's in his own name. Bernard swears that Epstein made two entries at Schenck's, 2 cases on September 10, and 14 on the 21st and 22d. Ten days before the first shipment he consulted Bernard, in the only talk they had that month, about storing goods with him, and asked him to take out insurance of $5,000 or $15,000. The size of the insurance precludes the idea that he then had in mind only the two cases entered on the 10th. Hence we have Bokal through Epstein entering these goods in Linde's under the name of Bokal at the moment when he purposed to store them in Epstein's own name at Schenck's. On the 22d he did withdraw them at Schenck's, and there they stayed till Epstein withdrew them some months later, erased the marks, and delivered them to the Rabinowitzes, who used them in the new business.

Why should Bokal at the same time have arranged to store goods first in his own name and later in Epstein's? This forbids the possibility of a sale by Bokal to Epstein after the goods had been stored at Linde's. It shows that the shifting about of the goods was prearranged from the outset, and is inconsistent with the innocence of the parties concerned. Men do not lay a plan to enter goods into one warehouse in one name, to withdraw them in the same name, and to re-enter them in another in another name, unless they have something to cover. It is absurd to attribute such maneuvering to innocent conduct. It is especially absurd when it is followed by orders to the truckman to erase even the second markings upon the goods after they have been withdrawn. Bernard's testimony, especially the date of Epstein's talk, clinches the matter in a way I did not observe upon the trial. There was ample evidence to show that Epstein was Bokal's agent throughout. They were connected by marriage, and the receipts were all sent to Bokal, as well as letters regarding the goods. Moreover, Bokal's motive is shown throughout the case, while Epstein appears to have none.

To sum up, we have the following situation as an entirety: Three bankrupts fail under circumstances strongly indicating a secretion of goods; they have

a relative who appears as a financial backer after the bankruptcy, when they at once go into the same line of business through the aid of a dummy; the backer at the same time when the bankrupts remove goods from their warehouse is found planning through his factotum to put substantially the same number of cases of the same kind of goods first in one warehouse in his own name, later in another in a different name, all of which is carried out to the letter; finally, after an appropriate interval, the goods come out of the second warehouse, the marks are erased by order of the backer's factotum, and they are delivered to the bankrupts and used by them. If a jury is not justified in making an inference from such a string of circumstances that the goods which the backer so smuggled around were the same as those the bankrupts withdrew, it is a little hard for me to see how we can ever proceed on circumstantial evidence.

The motion is denied. The defendants may have bail until they may apply to the Circuit Court of Appeals either to hear the cause on typed minutes, or for bail during the summer.